IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION
_____

| | |
|---|---|
| DAVID GUNDERSON, | Cause No. CV 13-35-BLG-SEH-CSO |
| Petitioner, | |
| vs. | ORDER TO STATE TO FILE ANSWER and |
| LEROY KIRKEGARD, Warden, Montana State Prison; ATTORNEY GENERAL OF THE STATE OF MONTANA, | FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |
| Respondent. | |

_____

On November 8, 2012, Petitioner David Gunderson filed this *pro se* action

seeking a writ of habeas corpus under 28 U.S.C. § 2254. Gunderson is serving state

sentences after being convicted of burglary and attempted sexual intercourse without

consent. Respondent ("the State") has complied with Orders to file documents from

the state court record. *See Docs. 5, 7, 9, 11.*

## I. Preliminary Screening

Rule 4 of the Rules Governing Section 2254 Cases in the United States District

Courts requires courts to examine the petition before ordering the respondent to file

an answer or any other pleading.  The petition must be summarily dismissed "[i]f it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief in the district court."  *Id.*

A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review."  *Calderon v. United States Dist. Court,* 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolaus*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases).  Consideration under Rule 4 "may properly encompass any exhibits attached to the petition, including, but not limited to, transcripts, sentencing records, and copies of state court opinions.  The judge may order any of these items for his consideration if they are not yet included with the petition."  Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases. "[I]t is the duty of the court to screen out frivolous applications and eliminate the burden that would be placed on the respondent by ordering an unnecessary answer."  *Id.*; *see also* 28 U.S.C. § 2243.

## II. Background

Stephanie Randall arrived home at about 2:00 a.m. on July 3, 2007.  While she was making herself something to eat, someone knocked at the door of her apartment.  She answered.  It was Gunderson.  He asked to use her telephone.  Randall told him she did not have a phone and shut the door.  She returned to her kitchen.  After she

finished her snack, she went to bed.

About half an hour later, Randall woke "to somebody getting in my bed," kissing her neck and touching her thigh. He pulled her underwear down four to six inches, but she stopped him by grabbing his hand. He also pinned her arms on the bed while she was on her back, but she struggled free. She reached up and turned on the light, which she could reach without getting out of bed. She immediately recognized the man who had earlier knocked on her door. His shirt and his shoes – new and brightly white – were on the floor, but he was wearing pants. She "was screaming pretty loudly" at him to get out. He was "telling [her] to knock it off and to calm down." Randall physically tried to throw him out, but he was concerned about retrieving his shoes and shirt. As he was attempting to pick them up, Randall grabbed his hair and started to drag him out of her apartment. She scratched his neck. Eventually she picked up his shoes and carried them to the front door. It was locked. She unlocked it, opened it, threw the shoes out, and ordered him to get out. When he was gone, Randall called 911.

Gunderson[1] was located a few blocks away, walking with another man. Based on Randall's description, his bright white shoes, and fresh scratch marks on

---

[1] Gunderson is currently described as six feet tall and 200 pounds. *See* ConWeb, https://app.mt.gov/conweb (accessed Aug. 15, 2013); *cf. Jamerson v. Runnels*, 713 F.3d 1218, 1227 (9th Cir. 2013).

Gunderson's neck and face, he was stopped and asked to take a portable breath test. His blood alcohol content was 0.086. He was arrested for a parole or probation violation.

Gunderson agreed to make a statement. He said he had taken a taxi to the Crystal Lounge, a local bar, earlier that night and jumped out of the vehicle without paying. After he went into the Crystal Lounge, he got into a fight with a man who scratched him on the neck, and then he was thrown out. He claimed he had been in a different part of town at the time of the crime. Gunderson told police he did not enter Randall's apartment and stated his DNA would not be found there.

Gunderson was photographed at the detention center. He had scratches not only on his face and neck but also one on his hand and one on his shoulder or chest that had previously been obscured by his shirt. Randall said she had seen "some tattoos" and most clearly remembered one somewhere on his chest or shoulder; Gunderson had several tattoos on his chest and shoulder. Shortly after the incident, Randall was shown a photographic lineup. She "immediately," in "seconds," identified Gunderson as the man who attacked her. Gunderson's DNA was not found in the apartment, but it was identified in a small scraping of blood taken from Randall's hand.

Gunderson was charged with burglary, a violation of Mont. Code Ann. § 45-6-204(1) (2005) (Count 1), and attempted sexual intercourse without consent (rape), a

violation of Mont. Code Ann. §§ 45-4-103 and -5-503 (Count 2). To prove burglary, the State had to prove he entered Randall's apartment with the intention of committing an offense. The State predicated rape as that offense. To prove attempted rape, the State had to prove beyond a reasonable doubt that Gunderson attempted to penetrate Randall's vulva or anus for his sexual gratification and without her consent. To prove attempt, the State had to prove that Gunderson did "any act toward the commission" of the offense "with the purpose to commit" the offense.

Trial commenced on February 19, 2008. In addition to the facts already described, a police witness testified that several businesses surrounding Randall's duplex all had accessible pay phones. The State also called an employee of the Crystal Lounge and the owners of the two taxi cab companies in Billings, each of whom had attempted but failed to corroborate Gunderson's taxi ride or the events at the bar. Gunderson testified as the last witness in the case. He maintained he had cheated a taxi driver and been in a fight just outside the Crystal Lounge, despite the lack of corroboration. He admitted his neck was not scratched at the Crystal Lounge. He explained that his hand injury came from construction work, and he re-injured it by scraping it on the concrete outside the Lounge.

Gunderson also admitted he was in Randall's apartment that night. He said he saw Randall enter her apartment alone at about 2:00 in the morning. He admitted he

did not want to use the phone but "just used that for an excuse to see who it was," because he thought he recognized "that chick" or "that broad" from the Rainbow Bar. He also said he wanted to "give her a chance to see if she recognized me." (He did not claim she did.) He said she opened the door to him but mumbled something and closed it in "[n]ot even a second." He returned half an hour later. He admitted the apartment was dark. He said he approached the door, opened the screen door, and found the inside door open about "half a foot." He entered the apartment, went into the kitchen, and then asked in a loud voice whether anyone was home. He thought he heard a noise or a voice and started down the short hallway saying "Where you at?" "Next thing I know, I'm standing in the middle of her bedroom." Someone – Gunderson was not sure at first whether it was the same person who had answered the door half an hour earlier – was lying in the bed with her back to him with a sheet "across the hip and most across the thigh going down towards the thigh." At that point, he knew it was the same person he had seen earlier. Gunderson testified:

> I sat down on the edge of the bed, and I said, "Hey, what's up?" And I put my hands on her hip and kind of on her – by the kidney here and then I moved it down to her leg. I said, "Hey." And at that time I kicked my shoes off, because I just bought those shoes and my feet was sweating. My feet was hurting from walking. And I turned and I didn't want to put my shoe up on the bed. So when I turned sideways on the mattress to talk to her, she rolled over. She said, "What are you doing? What are you doing in my house?" I said, "I'm going to come over and bullshit with you."

Trial Tr. (doc. 7-3) at 399:11-21.  When Randall continued yelling at him, Gunderson told her, "'I thought I heard you say come in or something.'"  When Randall got up, Gunderson said, "Where you going, man?"  Asked what Randall's demeanor was when she got out of bed, Gunderson said, "Kind of like aggressive," "[k]ind of like mad I was there."  *Id.* at 399:22-400:21.

Gunderson denied that he was trying to have sex with Randall and denied returning to her apartment for that purpose.  (He also denied touching her at all, even though he had just said he "put my hands on" her hip and leg.)  On cross-examination, he reiterated:

> I had no intentions of that.  If I was going to rape her or do something sexually to her, you know, if that's where my mind, my train of thought is at, then I had all the opportunity to do it.
>     . . . I didn't try nothing sexual on her, you know.  I could have – there's a lot of things a guy could have did.  I didn't attempt to do nothing.  I know for a fact I didn't.  I sat on the edge of the bed and didn't make no attempts to do anything sexual to her.

Trial Tr. (doc. 7-3) at 446:18-447:3.

The jury found Gunderson guilty on both counts.

Gunderson had been convicted in Broadwater County in 1994 of sexual intercourse without consent, *see State v. Gunderson*, 936 P.2d 804 (Mont. 1997),[2] and

---

[2]  This decision was overruled in part on Gunderson's appeal in the instant case.  The Montana Supreme Court held that a persistent felony offender sentence replaces the otherwise-applicable penalty for the underlying offense, rather than

released on parole just six weeks before committing the instant offense. He was designated a persistent felony offender, which elevated the maximum penalty for burglary from 20 years to 100 years. Mont. Code Ann. §§ 45-6-204(3), 46-18-502(1) (2005).[3] He had also been convicted in 1985 and in the early 1970's of similar offenses. Based on expert evaluation, the trial court designated Gunderson a Level 3 offender, that is, most likely to re-offend. Gunderson was sentenced to life in prison for attempted rape and to 100 years without parole for burglary, as a persistent felony offender. Both terms were consecutive to each other and to any revocation sentence imposed in Broadwater County. Judgment (doc. 7-6) at 1-3.

Gunderson appealed. Appellate counsel filed an *Anders* brief. The Montana Supreme Court granted counsel's motion to withdraw but appointed new appellate counsel, who proceeded with the appeal. After full briefing, the Montana Supreme Court affirmed Gunderson's conviction and sentence, excepting only the trial court's imposition of 51 conditions of supervision in the event Gunderson ever was released. On July 27, 2010, the case was remanded for vacation of those conditions. *State v.*

---

constituting a separate sentence imposed in addition to the sentence for the underlying offense. *See State v. Gunderson*, 237 P.3d 74, 84 ¶ 54 (Mont. 2010) (overruling *Gunderson*, 936 P.2d at 806-07).

[3] Subsequent references to the Montana Code use the version effective October 1, 2005.

*Gunderson*, 237 P.3d 74, 91 ¶¶ 110-111 (Mont. 2010).

On December 14, 2010, Gunderson filed a petition for postconviction relief in the trial court, asserting ineffective assistance of counsel at trial and on appeal. The trial court held that some of Gunderson's claims failed to meet the pleading standard for state postconviction relief and others were barred by *res judicata*, having been decided on direct appeal. Gunderson appealed. On February 12, 2013, the Montana Supreme Court affirmed the trial court's ruling. Order at 3 ¶¶ 5-6, *Gunderson v. State*, No. DA 12-0376 (Mont. Feb. 12, 2013) (unpublished) (doc. 7-37).

Gunderson timely filed his federal petition on March 8, 2013. 28 U.S.C. § 2244(d)(1)(A).

### III. Gunderson's Claims

Gunderson's claims are reorganized here. All are addressed.

First, Gunderson claims the evidence was not sufficient to support his conviction. Pet. Supp. (doc. 1-1) at 4 ¶ 3.

Second, Gunderson contends that the trial court erred in failing to instruct the jury on three points: consideration of the defendant's testimony, Pet. Supp. at 1 ¶¶ 1A, D; the definitions of the mental-state elements "purposely" and "knowingly," *id.* ¶ 1B; and the State's failure to collect physical evidence that could have been tested, *id.* ¶ 1C.

Third, Gunderson asserts that trial counsel was ineffective because he failed to raise an abandonment defense, Pet. Supp. at 2 ¶ 1A, 3 ¶ 3C; failed to request an instruction on a lesser-included offense, *id.*; failed to impeach the victim with conflicts between her pretrial statements and her trial testimony, *id.* ¶ 2B, 4 ¶ 3D; failed to challenge a biased juror for cause, *id.* ¶ 2C; failed to object to the erroneous mental-state definitions, *id.* ¶ 2D; and failed to request an evidentiary hearing so that Gunderson could air his complaints about counsel before trial, *id.* ¶ 2E.

Fourth, Gunderson avers the State failed to preserve the bedding and underwear and deprived him of exculpatory evidence. Pet. Supp. at 4 ¶¶ 3A-B. In light of his pleadings in state court, the Court will generously assume that Gunderson's nonspecific reference to "exculpatory evidence" also includes the State's failure to swab Randall's neck for DNA.

Fifth, Gunderson contends the trial court erred in imposing 51 conditions of supervision. Pet. Supp. at 5 ¶ 4. Sixth, he claims that he could not be sentenced both to life in prison and to 100 years without parole. Pet. Supp. at 6.

Finally, Gunderson claims that appellate counsel was ineffective because she failed to brief his issue regarding the instruction given regarding consideration of the defendant's testimony. Pet. Supp. at 5 ¶ 5.

## IV. Analysis

10

Although some or all of Gunderson's claims may be procedurally defaulted, it is clear that he is not entitled to relief on the merits of the following claims. Accordingly, it is more efficient to proceed to the merits. *See, e.g.*, 28 U.S.C. § 2254(b)(2); *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (making detailed analysis of constitutional issue despite outstanding question as to procedural bar); *Gutierrez v. Griggs*, 695 F.2d 1195, 1198 (9th Cir. 1983).

**A. Sufficiency of the Evidence**[4]

A state habeas petitioner is entitled to federal habeas relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also In re Winship*, 397 U.S. 358, 364 (1970) (federal Constitution requires "proof beyond a reasonable doubt of every fact necessary to constitute the

---

[4] The *Jackson* standard is already a difficult one for a defendant or petitioner to meet. But, where a state court has denied relief on the merits, a state prisoner may obtain federal habeas relief only if the state court's denial of his claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the state court's denial was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). Thus, on federal habeas review, a state prisoner must show even more than a federal defendant must show on direct review to obtain relief. Because the evidence against Gunderson was sufficient on *de novo* review, there is no need to consider whether or to what extent he falls further short under § 2254(d).

crime . . . charged.").  All of the evidence must be considered in the light most favorable to the jury's verdict.  *Jackson*, 443 U.S. at 319.  Because it is the jury's responsibility "fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts," *id.*, "a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume . . . that the [jury] resolved any such conflicts in favor of the prosecution, and must defer to that resolution," *id.* at 326.  Whether the evidence is sufficient to support a particular element beyond a reasonable doubt "must be gauged in the light of applicable [State] law defining the element."  *Id.* at 324.

As relevant here, to prove attempted sexual intercourse without consent, the State was required to prove that Gunderson, "with the purpose to commit" the offense of sexual intercourse without consent, did "any act toward the commission of such offense."  Mont. Code Ann. § 45-4-103(1) (2005).  "Sexual intercourse" means "any penetration, however slight," of "the vulva or anus of one person by a body member of another person," for the purpose of sexual gratification.  *Id.* § -2-101(68)(a) & (ii), (b).  "Without consent" means "the victim is compelled to submit by force against the victim or another."  Mont. Code Ann. § -5-501(1)(a)(I).  And "force" means "the infliction, attempted infliction, or threatened infliction of bodily injury or the commission of a forcible felony by the offender."  *Id.* § -501(2).  Finally, "[a] person

commits the offense of burglary if he knowingly enters or remains unlawfully in an occupied structure with the purpose to commit an offense therein." *Id.* § -6-204(1).

Here, a reasonable juror could have believed what Randall said Gunderson did: that he was "pretty intent in pulling it off" when he pulled her underwear down four or six inches and also briefly held both her arms, with her wrists parallel to her ears, while she was on her back, Trial Tr. (doc. 7-2) at 140:13-142:19, 143:19-144:17; and that she "got pushed back down" on the bed when she turned on the light but then got up, after a struggle that lasted "several minutes," *id.* at 145:22-146:12. A reasonable juror could have inferred, from these facts, that Gunderson was taking preliminary steps toward penetrating Randall without her consent. A reasonable juror could have found Gunderson's testimony at trial lacking in credibility and defying common sense. A reasonable juror could have concluded that Gunderson entered Randall's apartment with the intent to have sexual intercourse – with consent if there happened to be consent but without it if not. That is enough to establish the offense.

The State did not have to prove that Gunderson went into the apartment with the intention of deploying overwhelming physical force. It only had to introduce enough evidence to support a reasonable juror's conclusion, beyond a reasonable doubt, that Gunderson clandestinely entered the apartment to physically intimidate the woman he knew to be inside into having sexual intercourse with him. It did that. This

claim, Pet. Supp. at 4 ¶ 3, should be denied.

**B. Jury Instructions**

**1. Consideration of Defendant's Testimony**

Gunderson requested an instruction stating, "The defendant has testified. You should treat this testimony just as you would the testimony of any other witness."[5] Def. Proposed Jury Instr. No. 1 (doc. 11-1 at 5). He offered the instruction to "balance" the standard Montana instruction on witness testimony – specifically, the portion of that instruction that advises jurors they may consider "whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice." Jury Instr. No. 3 (doc. 11-2 at 7). The trial court declined to give the proposed instruction. Trial Tr. (doc. 7-3) at 452:6-21.

Even if Gunderson identified a federal basis for this claim, he fails to explain how he was prejudiced by omission of the proposed instruction. Counsel's explanation that "anybody with any common sense on the jury could interpret" the standard Montana instruction "to mean that the defendant certainly has more interest in the outcome of this case than anybody in the courtroom" is certainly true. Trial Tr. (doc. 7-3) at 452:10-13. But an instruction that specifically directs the jury to consider

---

[5] This is Ninth Circuit Model Jury Instr. (Crim.) No. 3.4 (2003). It has been part of the Ninth Circuit's model instructions since 2000.

the defendant's testimony under the same criteria as it considers the testimony of other witnesses, including bias or motive, does nothing to restrict the jury's exercise of common sense. *See also* Jury Instrs. Nos. 8, 9 (doc. 11-2 at 16-17).

The proposed instruction was properly denied because the defendant's testimony *is* like the testimony of any other witness. This claim, Pet. Supp. at 1 ¶¶ 1A, D, should be denied.

### 2. Mental-State Elements

The jury was instructed, in relevant part, as follows:

> A person commits the offense of burglary if the person knowingly enters or remains unlawfully in an occupied structure with the purpose to commit an offense therein.
> . . .
> To convict the Defendant of the charge of burglary, the State must prove the following elements:
> 1. That the Defendant knowingly entered or remained in an occupied structure unlawfully; and
> 2. That the Defendant did so with the purpose to commit the offense of Sexual Assault therein.
> . . .
> A person who knowingly subjects another person to any sexual contact without consent commits the offense of sexual assault.
> . . .
> A person acts knowingly when:
> 1. the person is aware of his or her conduct;
>     or
> 2. the person is aware there exists the high probability that the person's conduct will cause a specific result.
> A person commits the offense of Attempted Sexual Intercourse Without Consent when, with the purpose to commit the offense of

Sexual Intercourse Without Consent, the person commits any act, which constitutes a material step towards the commission of the offense of Sexual Intercourse Without Consent.

. . .

To convict the Defendant, DAVID WAYNE GUNDERSON, of the offense of Attempted Sexual Intercourse Without Consent, the State must prove the following elements:

1. That the Defendant performed an act which constituted a material step toward the commission of the offense of Sexual Intercourse Without Consent against S.R.; and

2. That the Defendant did so with the purpose to commit the offense of Sexual Intercourse Without Consent against S.R.

. . .

A person who knowingly has sexual intercourse without consent with another person commits the offense of Sexual Intercourse Without Consent.

. . .

A person acts purposely when it is his conscious object to engage in conduct of that nature or to cause such a result.

Each count charges a distinct offense. You must decide each count separately. The Defendant may be found guilty or not guilty of either or both of the offenses charged in Counts I and II. Your finding as to each count must be stated in a separate verdict.

A person who is in an intoxicated condition is criminally responsible for his conduct and an intoxicated condition is not a defense to any offense and may not be taken into consideration in determining the existence of a mental state of knowingly,[6] which is an element of the offenses of Burglary and Attempted Sexual Intercourse Without

---

[6] The jury could have been instructed that Gunderson's intoxication could not be considered in determining the existence of a mental state of purposely, because the scope of the controlling statute is not limited to the mental state of "knowingly." Montana law "preclude[s] voluntary intoxication as a defense" altogether. *See State v. Bingman*, 745 P.2d 342, 345 (Mont. 1987); Mont. Code Ann. § 45-2-203. But, to the extent omission of the word "purposely" suggested intoxication was a defense to the mental-state elements of attempt or burglary, its omission could only have benefitted Gunderson.

Consent.

Jury Instrs. Nos. 11-12, 15-19, 21-23 (doc. 11-2 at 19-20, 23-27, 29-31).

The jury was correctly instructed that Gunderson was not guilty of attempt if he acted knowingly but not purposely. It was correctly instructed that Gunderson was guilty of attempted sexual intercourse without consent if he had a conscious object to engage in sexual intercourse without consent or to cause the result of sexual intercourse without consent; and that Gunderson was guilty of burglary if he had a conscious object to engage in sexual assault or to cause the result of sexual assault. If a defendant harbors an intent to commit or attempts to commit a crime, he necessarily makes it his "conscious object to engage in" the crime and his "conscious object to cause the result" of completion of the crime. In other words, where specific intent and attempt are concerned, the two phrases mean the same thing. In other contexts, that will not be the case, but it is the case with intent and attempt. *Compare, e.g.*, *State v. Rothacher*, 901 P.2d 82, 84-87 (Mont. 1995) (discussing *State v. Sigler*, 688 P.2d 749 (Mont. 1984), and holding that consciously engaging in conduct of fighting does not suffice to prove mental state for deliberate homicide and jury must be instructed to decide whether defendant contemplated the same kind of harm or injury that led to death).

There was no discernible error in the jury's instructions on the mental states of

"purposely" and/or "knowingly." This claim, Pet. Supp. at 1 ¶ 1B, and the corresponding claim of ineffective assistance of counsel, *id.* at 2 ¶ 2D, should be denied.

### 3. State' Failure to Collect Evidence

Counsel asked the trial court to instruct the jury that it could presume testing of the bedding and underwear would have been favorable to Gunderson because the State could have collected and tested it but failed to do so. Trial Tr. (doc. 7-3) at 455:19-456:5; Def. Proposed Instr. No. 2 (doc. 11-1 at 6). State law provides presumptions that "[e]vidence willfully suppressed would be adverse if produced," Mont. Code Ann. § 26-1-602(5), and "[m]ore satisfactory evidence would be adverse if weaker and less satisfactory evidence is offered and it is within the power of the party to offer more satisfactory evidence," *id.* at -602(6). But even state law does not support an instruction based on the theory that police must gather all conceivably relevant evidence. *See City of Great Falls v. Morris*, 134 P.3d 692, 696 ¶¶ 24-27 (Mont. 2006). Gunderson points to no federal authority establishing any parallel presumptions at all, much less a federal presumption that would go beyond state law and require the instruction Gunderson proposed. The Court is aware of none.

At any rate, Gunderson was not prejudiced by the absence of such an instruction. Counsel argued that Randall's account of scratching and clawing at

Gunderson on the bed and of Gunderson pulling her underwear down should have led investigators to take the bedding and underwear and examine them for substantiating evidence. He argued their failure to do so should give rise to reasonable doubt. Trial Tr. (doc. 7-4) at 492:22-493:2, 493:16-495:20. The jury was correctly instructed that the State had the burden of proof, Jury Instr. No. 4 (doc. 11-2 at 8-9), and that it must present evidence sufficient to prove each element of the crimes beyond a reasonable doubt, *id.* Nos. 12, 18 (doc. 11-2 at 20, 26). These instructions were sufficient to assure that th. e jury weighed against the State any evidence it might consider to be "missing." This claim, Pet. Supp. at 1 ¶ 1C, should be denied.

## C. Ineffective Assistance of Trial Counsel

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Gunderson must allege facts sufficient to support an inference (1) that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. A reasonable probability is less than a preponderance of the evidence. *Id.* "[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

### 1. Abandonment Defense

Gunderson claims counsel should have argued that he abandoned the offense. Under Montana law, a person is not liable for attempt if, "under circumstances manifesting a voluntary and complete renunciation of his criminal purpose, he avoided the commission of the offense attempted by abandoning his criminal effort." Mont. Code Ann. § 45-4-103(4) (2005). But there was no evidence from which a reasonable juror could have found that Gunderson's abandonment was "voluntary." He testified himself that Randall was "screaming at me to leave," Trial Tr. (doc. 7-3) at 440:1, and acting "[k]ind of like aggressive," "[k]ind of like mad I was there," *id.* at 400:17-21. The defense is not available "where the defendant fails to complete the attempted crime because of unanticipated difficulties, unexpected resistance or circumstances which increase the probability of detention or apprehension." *State v. Mahoney*, 870 P.2d 65, 100 (Mont. 1994). These were among counsel's reasons for not requesting the instruction. In his affidavit, trial counsel explained:

> The victim in this case against Gunderson testified she fought him off by actively and vigorously resisting Gunderson's attempt to pull down her underwear and to pin her down on her bed. TR Vol. I, pp. 142-44; 145-47. She testified she grabbed his hand to stop him from pulling down her underwear, yelled loudly and kicked him. She scratched him and pulled his hair.
> Furthermore, as a tactical matter this defense instruction contradicted the defense theory, to which Gunderson himself testified, that his presence in the victim's apartment was completely innocent....

*See* Kelleher Aff. (doc. 7-24) at 1-2 ¶ 2. These reasons are well-supported in the law.

Neither prong of the *Strickland* test is met. All claims relating to an abandonment defense, Pet. Supp. at 2 ¶ 1A, 3 ¶ 3C, should be denied.

## 2. Lesser-Included Offense

On direct appeal, Gunderson asserted that counsel should have requested instructions on criminal trespass and on attempted sexual assault. Appellant Br. (doc. 7-8) at 23-24. The Montana Supreme Court dismissed the claim as a matter for postconviction proceedings. *See Gunderson*, 237 P.3d at 87-88 ¶¶ 77-78. In postconviction proceedings, when Gunderson was representing himself, he asserted that counsel should have requested an instruction on attempted sexual assault. Counsel's affidavit in response to the petition explained why he did not request an instruction on attempted sexual assault. Kelleher Aff. (doc. 7-24) at 2-3 ¶ 3.

Montana law holds that "a lesser included offense instruction is not supported by the evidence where the defendant's evidence or theory, if believed, would require an acquittal." *State v. Martinez*, 968 P.2d 705, 707-08 ¶¶ 9-15 (Mont. 1998); *see also, e.g.*, *State v. Jay*, 298 P.3d 396, 407 ¶ 44 (Mont. 2013). As to attempted sexual assault, therefore, there is no reasonable probability that Gunderson would have obtained a lesser-included offense instruction, because he testified that he did not touch or intend to touch Randall in a sexual manner. *E.g.*, Trial Tr. (doc. 7-3) at 402:17-403:6. In addition, Counsel explained that he relied on Gunderson's testimony

in deciding not to request an instruction on attempted sexual assault. Kelleher Aff. (dc. 7-24) at 2-3 ¶ 3. Counsel could not have been ineffective for failing to request an instruction precluded by Montana law, and Gunderson offers no other basis for his entitlement to the instruction. As to attempted sexual assault, therefore, Gunderson's claim, Pet. Supp. at 2 ¶ 2A, should be denied.

But it is not clear, at this stage, that a claim as to a lesser included offense of criminal trespass, Pet. at 2 ¶ 2A, is conclusively lacking in merit or is subject to dismissal on procedural grounds. *See Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309, 1312 (2012). An Answer is required on this portion of the claim.

### 3. Failure to Impeach Victim

The only instance Gunderson has given of counsel's failure to impeach the victim was aired at the trial court's colloquy on the second morning of trial, when Gunderson complained of counsel's performance. Gunderson stated that he believed Randall contradicted herself on three occasions. First, when interviewed by the defense, Randall was asked, "Did he succeed in pulling off your underwear at all?" She responded, "No, I made sure it stayed on." Trial Tr. (doc. 7-3) at 260:19-261:3. Gunderson suggested this statement contradicted her trial testimony that he pulled her underwear down about six inches. Trial Tr. (doc. 7-2) at 140:23-141:16. As counsel said, if there is any conflict between those statements, it is best described as "de

minimis." Trial Tr. (doc. 7-3) at 261:4.

As for the other two occasions, counsel brought out the contradictions Gunderson identified between Randall's pretrial statement and her trial testimony. *Compare* Trial Tr. (doc. 7-3) at 261:8-23 *with* Trial Tr. (doc. 7-2) at 167:5-168:10; Trial Tr. (doc. 7-3) at 262:5-10 (mistaking Ross for Wichman) *with* Trial Tr. (doc. 7-2) at 193:21-195:9.

This claim, Pet. Supp. at 2 ¶ 2B, should be denied.

### 4. Failure to Challenge Juror for Cause

Gunderson alleges that counsel should have challenged Juror Jensen for cause, whereas counsel used a peremptory strike to remove Jensen. Trial Tr. (doc. 7-2) at 106:18-107:1. She initially said that she would find Gunderson guilty if asked to make the decision in voir dire, before the State presented any evidence, because she considered the charges as evidence that he committed the crimes. Trial Tr. (doc. 7-2) at 76:12-79:10. But she also said she was "second-guessing" that position and thought she could keep "a fair and open mind" and listen to the evidence, *id.* at 77:15-20, 78:14-16, and she said that if she put herself in Gunderson's position, she would want a person like her on the jury, *id.* at 79:11-22. Although she equivocated, it was not unreasonable for counsel to believe a challenge for cause would not be successful. This claim, Pet. Supp. at 2 ¶ 2C, should be denied.

## 5. Failure to Request Evidentiary Hearing

Gunderson claims counsel should have requested a mid-trial evidentiary hearing when the trial court was hearing Gunderson's complaints about counsel in chambers before the second day of trial. Under state law, a trial court is required to hold a hearing if, on "initial inquiry," the defendant's complaints about counsel are "seemingly substantial." *State v. Gallagher*, 955 P.2d 1371, 1374 ¶ 15 (Mont. 1998). "[S]uch an initial inquiry may be adequate where the court considered the defendant's factual complaints together with counsel's specific explanations addressing the complaints." *Id.* (internal quotation marks omitted).

The trial court heard Gunderson's complaints about counsel's failure to impeach the victim; that claim, as explained, is meritless. The trial court also heard Gunderson's complaints about counsel's delay in seeking witnesses to corroborate the defense account of Gunderson's movements that night. While it is possible to read the colloquy in the transcript as if Gunderson was speaking of alibi witnesses, he has never claimed that counsel was ineffective for failing to locate or call alibi witnesses.[7] Gunderson spoke of the matter in the colloquy only as a matter of corroboration. *E.g.*, Trial Tr. (doc. 7-3) at 263:24-264:1. He did not then or at any point afterward in his

---

[7] This would be a difficult claim to pursue since Gunderson admitted at trial that he was in Randall's apartment.

postconviction petition claim that he had an alibi and was actually with someone else at the time of the crime. Given that, the proposed testimony corroborating Gunderson's account of his movements was of considerably less probative value than Gunderson's and the victim's accounts of what happened in the apartment. A reasonable juror could have believed Gunderson's corroborating witnesses and still found him guilty.

It was not unreasonable for the trial court to conclude that counsel was fully prepared to defend Gunderson and that the possible corroborative witnesses were not central to the defense. The conflict between Gunderson and counsel was not great enough to warrant a hearing. If counsel had requested one, there is no reasonable probability it would have been granted, much less that Gunderson would ultimately have obtained new counsel. This claim, Pet. Supp. at 2 ¶ 2E, should be denied.

### D. Uncollected Evidence

Gunderson claims he was deprived of due process because investigators did not collect Randall's underwear or bedding. Very liberally construing his assertion that he was deprived of "exculpatory evidence," Pet. Supp. at 4 ¶ 3B, he may also be understood to complain of investigators' failure to swab Randall's neck for DNA, *see* Appellant Br. (doc. 7-8) at 27-28.

"[W]hen we deal with the failure of the State to preserve evidentiary material

[which] could have been subjected to tests, the results of which might have exonerated the defendant," the defendant is entitled to relief against his conviction only if he shows police acted in bad faith. *Youngblood*, 488 U.S. at 57-58.

Gunderson fails to explain what he could have gained from any of this evidence, how it could have exonerated him, or why investigators acted in bad faith when they failed or declined to collect it. Counsel suggested at trial that the underwear, if collected, might have been stretched out of shape if Gunderson had attempted unsuccessfully to pull it down. It might have been, but it might just as well not have been. Unstretched underwear would not have proved Gunderson did not attempt to pull it down.

Similarly, assuming that the bedding had been tested or that Randall's neck had been swabbed but none of Gunderson's DNA found, those results would not indicate either that he was not present or that he did not kiss Randall's neck. It would indicate only that none of his DNA was found.

Further, Randall's account of events did not suggest Gunderson's DNA was likely to be found on the bedding. Officer Wichman testified that he looked at the bedding, did not see any blood or trace evidence on it, and so decided not to collect it. Also, the victim did not report any intercourse or sexual penetration, so the officer was not concerned with vaginal fluids or semen. Trial Tr. (doc. 7-2) at 190:10-22,

193:21-195:9.[8]   This scenario does not support an inference of bad faith or, consequently, a *Youngblood* claim.

Finally, Gunderson's DNA *was* found – in his blood on Randall's hand, thereby corroborating her account of scratching him to get him off her and out of her apartment.

This claim, Pet. Supp. at 4 ¶¶ 3A-B, should be denied.

**E. Sentencing Issues**

Gunderson's sentencing issues fail to allege a violation of federal law.  28 U.S.C. § 2254(a).  The Montana Supreme Court is the final authority on the interpretation of Montana law.  *Wisconsin v. Mitchell*, 508 U.S. 476, 483 (1993); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  If the Montana Supreme Court decides that state law authorized Gunderson's sentences, then state law authorized Gunderson's sentences.  As for the 51 conditions, even if their imposition gave rise to a federal claim, they no longer exist because the Montana Supreme Court ordered them vacated.

---

[8] Wichman also testified that he looked for fingerprints in the apartment but was not able to find any clear enough to support an identification, not even Randall's.  Trial Tr. (doc. 7-2) at 184:9-25.  Just as the absence of Randall's fingerprints did not mean the apartment was not hers, so the lack of results from testing the underwear and bedding would not have meant Gunderson did not do what Randall said he did.

Both of Gunderson's sentencing claims, Pet. Supp. at 5 ¶ 4, and at 6, should be denied.

## F. Ineffective Assistance of Appellate Counsel

Claims of ineffective assistance of appellate counsel are governed by the *Strickland* standards. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Gunderson claims appellate counsel was ineffective because she did not adequately brief on direct review his entitlement to the Ninth Circuit instruction on the defendant's testimony that he had requested and been denied at trial. But Gunderson fails to show he was entitled to the instruction or was prejudiced by its omission. Therefore, he can show neither that appellate counsel's performance fell outside the wide bounds of reasonable professional assistance nor a reasonable probability that the Montana Supreme Court would have remanded his case for a new trial with the instruction. This claim, Pet. Supp. at 5, ¶ 5, should be denied.

Based on the foregoing, the Court enters the following:

## ORDER

1. The State is deemed served by electronic delivery of this Order to the Montana Department of Justice general e-mail address for court filings. State's counsel must forthwith file a Notice of Appearance to ensure receipt of all further

filings in this matter.

2.   On or before **October 30, 2013,** the State must file an Answer to Gunderson's claim that counsel was ineffective for failing to request a lesser-included offense instruction on criminal trespass.

3.   Procedural defenses must be pled in the Answer.  The State may also file a motion, but it may not file a motion in lieu of an Answer.

4.   Within twenty-one days after the State serves its Answer, Gunderson may file a Reply, limited to **seven (7) pages**, excluding exhibits.  If the State also files a motion, Gunderson may respond to it within twenty-one days after its service.  The State may file a reply in support of any motion within fourteen days after filing of the response in accordance with D. Mont. L.R. 7.1.

5.  **Unless State's counsel objects within seven (7) days of the date of this Order**, Gunderson need not serve on the State the materials he files with this Court. The State will be served via the electronic filing system.   The State must, however, serve on Gunderson a complete copy of everything it submits to the Court.

The Court also enters the following:

## RECOMMENDATION

Except Gunderson's claim alleging that counsel was ineffective for failing to

request a lesser-included offense instruction on criminal trespass, Pet. at 2 ¶ 2A, all claims should be DENIED for lack of merit.

## NOTICE OF RIGHT TO OBJECT
## TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), Gunderson may serve and file written objections to this Findings and Recommendation within fourteen (14) days of the date entered as indicated on the Notice of Electronic Filing.  If Gunderson files objections, he must itemize each factual finding to which objection is made and must identify the evidence in the record he relies on to contradict that finding; and he must itemize each recommendation to which objection is made and must set forth the authority he relies on to contradict that recommendation.  Failure to assert a relevant fact or argument in objection to this Findings and Recommendation may preclude Gunderson from relying on that fact or argument at a later stage of the proceeding.  A district judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made.  The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendation.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

Gunderson must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address."  Failure to do so may result in

dismissal of his case without notice to him.

DATED this 25th day of September, 2013.

_/s/ Carolyn S. Ostby_
United States Magistrate Judge